UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 8:24-cv-00497-JVS-JDE | Date | November 19, 2024 |
| Title | Kim Matthews v. The Prudential Insurance Company of America et al | | |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| | |
|---|---|
| Elsa Vargas | Not Present |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS] Order Regarding Defendant's Motion to Dismiss, Motion to Strike, and Request for Judicial Notice [43]**

On October 3, 2024, Defendant The Prudential Insurance Company of America ("Prudential") filed a motion to dismiss the second amended complaint and strike class allegations (Mot., Dkt. No. 43.), and a request for judicial notice and consideration of documents incorporated in the second amended complaint. (RJN, Dkt. No. 43-1.) Plaintiff Kim Matthews ("Matthews") filed an opposition to the motion ("Opp'n 1," Dkt. No. 44) and objections to the evidence and request for judicial notice. ("Opp'n 2," Dkt. No. 45.) Prudential filed a Reply. (Reply, Dkt. No. 46.)

For the following reasons, the Court **GRANTS** the motions in part and **DENIES** the motions in part.

## I. BACKGROUND

The following factual allegations come from the Second Amended Complaint ("SAC").

Matthews is the daughter of long-term care policy ("Policy") holder Hedwig Nosek ("Nosek") and administrator of her estate. (SAC ¶ 9.) The Policy was originally issued by Prudential in approximately 1972 to Nosek's then-husband as a benefit of his employment by Delta Airlines. (Id. ¶ 10.) When Nosek and her husband divorced, the Policy "transferred to her and she continued to make premium payments until on or about July 3, 2014, when she sought the Policy benefits in the form of monthly reimbursement payments for her assisted living facility care." (Id.) On May 2, 2014, Matthews initiated a claim for long-term care benefits for Nosek by calling a Prudential

customer service agent. (Id. ¶ 23.) On May 5, 2024, Nosek made a $131.81 premium payment to Prudential and Prudential sent a letter to Nosek acknowledging the initiation of benefits. (Id. ¶ 24-25.) On June 3, 2014, Nosek made another premium payment in the amount of $131.81 to Prudential. (Id. ¶ 30.)

Prudential had a practice of presenting "Inflation Offers" to the policy holder every three years. (Id. ¶ 19.) According to the Complaint, these Inflation Offers allowed "for the insured to increase the maximum daily benefits and lifetime maximum [("LTM")] benefits... to match inflation." (Id.) In particular, these Offers stated:

> "If you accept the offer, the amount of the additional benefit shall be the difference between your existing benefits and those benefits compounded annually at a rate of five percent for the period beginning with the purchase of your existing benefits and extending until the year in which the offer is made."

(Id.) The Inflation Offers sent to policyholders in 2014 stated that the offer would automatically take effect unless the policyholder explicitly rejected the offer in writing. (Id. ¶ 20.) The Policy informed policyholders that the Inflation Offer would not take effect "if the insured is 'benefits eligible', meaning receiving benefits from the policy at the time." (Id.) The Offer also expressly stated that, once the Offer is effective, "the insured will receive a Confirmation Statement 'confirming the change to your benefit maximums.'" (Id. ¶ 31.)

On June 4, 2014, before Prudential had determined Nosek's benefits eligibility, Prudential sent an Inflation Offer to Nosek. (Id.) The Offer stated that Nosek's daily maximum would increased to $270 and the premium amount would increase to $187.02. (Id. ¶ 32.) On June 17, 2014, Prudential issued Nosek a Confirmation Statement that reflected a LTM of $492,750. (Id. ¶ 22.) This information was also indicated on the Certificate of Insurance ("492K COI") issued to Nosek on June 17, 2014, which acted as the "cover sheet" to the Policy. (Id. ¶ 35-36.) Prudential eventually found that Nosek was eligible for benefits and set the "Benefits Eligible" date retroactively to May 2, 2014. (Id. ¶ 42.) Matthews continued to rely on the 492K COI statement of the LTM, and "[a]t no time from 2014-2021" did Prudential inform Matthews that the LTM was no longer $492,750. (Id. ¶ 43.)

On August 4, 2014, Matthews secured placement for Nosek at an assisted living

facility in Costa Mesa, California, for $3,990 per month, which increased to $4,150 in 2015, $4,225 in 2016, and $4,400 in 2017. (Id. ¶ 44, 49-50, 54.)

On July 11, 2017, Prudential sent Nosek another Inflation Offer which, if accepted, indicated a daily maximum of $313 and a new LTM of $571,225. (Id. ¶ 51.) This new Offer also stated that policyholders must affirmatively opt in to accept the Offer. (Id. ¶ 52.) On July 11, 2017, Matthews faxed her signed acceptance of the Offer to Prudential. (Id.)

In July 2018, Nosek moved to a memory care facility in Orange County, California with a monthly cost of $5,625. (Id. ¶ 56.) In May 2019, Nosek moved to a facility in Rancho Mirage, California, with a monthly cost of $4,135. (Id. ¶ 57.) In October 2019 the cost of this facility increased to $4,457 per month. (Id. ¶ 58.) In July 2021, Nosek moved again to a memory care facility in Hemet, California, with a monthly cost of $2,500. (Id. ¶ 59.)

On October 2, 2021, Prudential informed Nosek that "she was no longer eligible for benefits, and the waiver of premium payments no longer applies." (Id. ¶ 60.) However, this was due to an error on the part of Prudential, who had sent requests for information to a care facility in which Nosek no longer lived. (Id.) On November 2, 2021, Prudential sent Nosek a Confirmation Statement which confirmed that Nosek's LTM was $571,225. (Id. ¶ 53, 61.) On November 18, 2021, Prudential confirmed with Nosek via letter that the LTM had increased to $571,225 and she had $202,289.98 remaining on the Policy. (Id. ¶ 62.)

In September 2022, Nosek's memory care facility in Hemet closed, and she moved to another facility in the same city with a monthly cost of $4,100. (Id. ¶ 63-64.) In January 2022, Prudential "sent a letter to... Nosek indicating receipt of an accepted Inflation Offer but the increase in coverage would be delayed because... Nosek was currently receiving benefits." (Id. ¶ 68.) However, the letter did not indicate any changes to the Policy Contract and did not reference a specific Inflation Offer. (Id.)

On approximately May 23, 2023, Matthews "estimated, and relied upon, [Prudential]'s representations that there was no less than approximately... $70,000" left in benefits under the policy. (Id. ¶ 69.) When Matthews called Prudential to confirm the balance, it informed her that a balance of $6,000 remained. (Id.) Matthews then

attempted to resolve this discrepancy with Prudential and began the process of enrolling Nosek in Medi-Cal and the California Assisted Living Waiver Program. (Id. ¶ 70.) Around the same time, Matthews also paid the memory care facility $10,000 to cover past payments. (Id. ¶ 71.)

On June 8, 2023, "Prudential sent a letter stating that **both** the 2014 and 2017 inflationary offers were disallowed retroactively in 2021 as Prudential determined that Nosek was not benefit eligible." (Id. ¶ 72.) Prudential also attached to this letter a Confirmation Statement, dated May 31, 2023, stating that the LTM was now $425,225 ("425K COI"). (Id.) The Complaint states that Prudential's position is that it "made a mistake" when it previously increased the LTM. (Id.)

On June 9, 2023, Prudential denied $3,075.34 in claims, alleging that the LTM had been reached. (Id. ¶ 73.) On June 12, 2023, Prudential sent a letter confirming that the Policy had terminated on May 13, 2023. (Id. ¶ 74.) On or about June 13, 2023, "Nosek suffered a heart attack and was hospitalized for about a week." (Id. ¶ 75.) Nosek passed away on July 26, 2023. (Id. ¶ 77.)

Matthews brings four claims: (1) breach of contract, (2) breach of the covenant of good faith and fair dealing under California Insurance Code § 10234.8, (3) negligent misrepresentation, and (4) unfair competition under California Business and Professions Code § 17200 et seq. ("Unfair Competition Law"). (See generally id.)[1]

## II. Legal Standard

### *A. Motion to Dismiss*

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct

[1] Prudential notes that the SAC lists causes of action for fraud and fraudulent inducement in its caption, but these causes are not plead in the body of the SAC. (Mot. at 3 n.1.) Thus, the Court assumes that Matthews has not properly asserted these causes of action.

alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In resolving a Rule 12(b)(6) motion under Twombly, the Court must follow a two-pronged approach. First, the Court must accept "all well-pleaded" factual allegations as true, and construe such allegations "in the light most favorable to the non-moving party." Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010) (citation omitted). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Moreover, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Id. (quoting Twombly, 550 U.S. at 555). Second, assuming the veracity of well-pleaded factual allegations, the Court must "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. This determination is context-specific, requiring the Court to draw on its experience and common sense, but there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id.

*B. Motion to Strike Class Allegations*

Under Federal Rules of Civil Procedure 12(f), a court "may strike from a pleading. . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Immaterial matters have "no essential or important relationship to the claim for relief." Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517, 534 (1994).

Class allegations are generally not tested at the pleadings stage and instead are usually tested after one party has filed a motion for class certification. See, e.g., Thorpe v. Abbott Labs., Inc., 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008); In re Wal-Mart Stores, Inc. Wage & Hour Litig., 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007). However, as the Supreme Court has explained, "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982). Thus, a court may grant a motion to strike class allegations if it is clear from the complaint that the class claims cannot be maintained. See, e.g., Sanders v. Apple, Inc., 672 F. Supp. 2d 978, 990–91 (N.D. Cal. 2009).

The granting of such motions is rare before class certification. See Cholakyan v.

Mercedes-Benz USA, LLC, 796 F. Supp. 2d 1220, 1245 (C.D. Cal. 2011). More often, courts conclude that preemptive motions to strike class allegations "are more properly decided on a motion for class certification, after the parties have had an opportunity to conduct class discovery and develop a record." Id. (internal quotation marks and citation omitted).

## III. Discussion

### *A. Request for Judicial Notice*

Prudential filed a Request for Judicial Notice and Consideration of Documents ("RJN") in support of its motion to dismiss and motion to strike. (RJN.) Specifically, Prudential seeks judicial notice of the following:

1. Silvia Decl. Ex. 5: copy of a May 20, 2014 letter from Prudential to Nosek
2. Silvia Decl. Ex. 6: copy of a June 10, 2014 letter from Prudential to Nosek
3. Silvia Decl. Ex. 7: copy of a July 22, 2014 letter from Prudential to Nosek
4. Silvia Decl. Ex. 8: copy of a January 5, 2022 letter from Prudential to Nosek
5. Silva Decl. Ex. 9: copy of a July 24, 2017 letter from Prudential to Nosek
6. Silva Decl. Ex. 10: copy of a September 8, 2017 letter from Prudential to Nosek

Because factual challenges have no bearing under Rule 12(b)(6), generally, the Court may not consider material beyond the pleadings in ruling on a motion to dismiss. Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001), overruled on other grounds, Galbraith v. Cnty. of Santa Clara, 307 F. 3d 1119, 1125 (9th Cir. 2002). There are, however, three exceptions to this rule that do not demand converting the motion to dismiss into one for summary judgment. Id. First, pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of matters of public record, but it "cannot take judicial notice of disputed facts contained in such public records." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 999 (9th Cir. 2018) (citing Lee, 250 F.3d at 689); see

Fed. R. Evid. 201(b). Second, the Court also may take judicial notice of documents attached to or "properly submitted as part of the complaint." Lee, 250 F.3d at 688. Third, if the documents are "not physically attached to the complaint," they may still be considered if the documents' "authenticity . . . is not contested" and the documents are necessarily relied upon by the complaint. Id; United States v. Corinthian Colleges, 655 F.3d 984, 998–99 (9th Cir. 2011). "However, if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint" and cannot be incorporated by reference. Khoja, 899 F.3d at 1002.

Matthews does not oppose Prudential's Request for Judicial Notice of Silva Decl. Ex. 6-9. Further, these documents are each either expressly referenced and relied on in the SAC, or are an integral part of the SAC. (RJN, at 3-4.) Therefore, the Court grants Prudential's Request as to these documents.

However, Matthews disputes the authenticity of Silva Decl. Ex. 10. First, Matthews claims that the declarant has not properly laid the foundation "of how he knows this letter was actually sent to Ms. Nosek." (Opp'n 2, at 2.) Second, Matthews argues that the letter is a "'redline' form, the letterhead font differs from other correspondence submitted by Defendant and it appears to be a draft letter never sent." (Id.) Prudential admits that this letter was not expressly referenced in the SAC, but claims that it is integral to the SAC "because it confirms Ms. Nosek's LTM, which is the crux" of the Complaint. (RJN, at 4.) Additionally, Prudential states that "a qualified declarant testified that it is a copy retrieved from Prudential's records that would have been sent pursuant to its ordinary mailing procedures." (Reply, at 17 n.2.) However, because this document was not explicitly referenced in the SAC, and because its authenticity is contested, the Court declines to take judicial notice of Silva Decl. Ex. 10.

The Court **GRANTS** the Request for Judicial Notice as to Silva Decl. Ex. 6-9 and **DENIES** the Request as to Silva Decl. Ex. 10.

*B. Matthews' Breach of Contract Claim*

The SAC outlines two main theories regarding the breach of contract claim: (1) the Inflation Offers sent in 2014 and 2017 modified the Policy contract when accepted by

the Policyholder, and (2) the Confirmation Statements sent in 2014 and 2021 altered, modified, or endorsed the Policy. Prudential moves to dismiss Matthews' breach of contract claim on both of these theories.

1. Inflation Offers

The parties do not dispute that, under the language of the Policy, Inflation Offers only apply if the policyholder is deemed non-benefits-eligible. Specifically, the Policy states: "You will be offered the increase in Coverage even if you meet the Benefit Eligibility Criteria. However, the increased Coverage will not take effect until you no longer meet the Benefit Eligibility Criteria." (SAC, Ex. B, 22.) Matthews argues that the 2014 and 2017 Inflation Offers went into effect because Nosek was temporarily deemed non-benefits-eligible when these Offers were sent and, thus, accepted both of these offers. (Opp'n at 6, 10.) The SAC alleges: "The Policy Contracts were occasionally modified when policyholders accepted and Prudential implemented increased benefits through Inflation Offers." (SAC, ¶ 105.)

In contrast, Prudential claims that the Inflation Offers sent in 2014 and 2017 did not increase the LTM under the Policy because Nosek was benefit-eligible from 2014 and until the Policy terminated. (Mot. at 10.) This argument rests on the theory that the temporary changes to Nosek's benefits eligibility "did not permanently modify the [P]olicy." (Reply, at 8.) Thus, because Prudential reversed Nosek's non-benefits eligibility status during each of these periods, Nosek was benefits-eligible during the relevant periods of the Inflation Offers, and the condition precedent to acceptance was not met. (Mot. at 10.)

In its Order dismissing the First Amended Complaint ("FAC") this Court held that Prudential did not breach the Policy when it offered, but did not put into effect, the LTM increase provided by the Inflation Offers. (Order, Dkt. No. 37, 9.) Thus, for the same reasons outlined in the Court's previous order dismissing the FAC, Matthews has failed to state a claim for breach of contract on the theory that the Inflation Offers themselves modified the contract.

2. Confirmation Statements

In its Order dismissing the FAC, the Court declined to address the theory that the Confirmation Statements were contracts themselves, or modified the Policy, because this theory did not appear in the FAC. (Order, at 10.) However, because the SAC alleges

that the Confirmation Statements sent in 2014 and 2021 altered, modified, or endorsed the Policy, the Court now addresses this argument. (See SAC ¶¶ 35, 53, 72, 109, 145(b).)

Matthews first argues that the Confirmation Statements acted as modifications to the Policy because the Inflation Offers were clear offers, Nosek accepted those offers, and Nosek paid consideration through increased premiums. (Opp'n at 11-12.) However, as stated above, the Inflation Offers themselves did not alter the policy terms given that Nosek was deemed benefits-eligible through all relevant periods. Thus, this argument fails.

Second, Matthews argues that the "Confirmation Statements are an enforceable part of the contract dictated by the Policy" and are "part and parcel" of the Policy under Cal. Ins. Code § 381 (Id. at 6, 12.) Specifically, because the Policy only includes a Schedule of Benefits and does not specify the premium amount as required under Ins. Code § 381, the Confirmation Statements are the part of the Policy providing this "necessary information." (Id. at 12, 14.) This argument is based on the fact that "the Policy clearly states: 'Your Confirmation Statement will indicate your Plan selection,'" and "'Your premium contribution is shown on your Confirmation Statement.'" (Id. at 13; SAC, Ex. B, 5, 10.) Thus, Matthews claims that the Confirmation Statements modify the Policy because "they function as the written proof and promise of a specific amount of coverage, and show the current premium owed." (Opp'n at 13-14.)

In contrast, Prudential argues that Ins. Code § 381 does not suggest that "subsequent communications containing related information *automatically* become part of the [P]olicy." (Reply, at 12.) Further, the Policy "does not say that the Confirmation Statements *modify* (or endorse) the Policy to unilaterally effect a change." (Id.) In fact, Prudential argues that the language in the Statements and Policy indicate that the "Confirmation Statements merely confirmed benefits, whether current or pending, *under the Policy*." (Id.) This complies with the Policy's language that "it 'alone forms the agreement under which payment of the insurance is made.'" (Mot. at 17.) Finally, Prudential argues that, even though the Inflation offers stated "that an 'effective' offer would be followed by a Confirmation Statement 'confirming the change in your benefits maximums,'" this does not mean that the Confirmation Statements alone set the LTM. (Id.) This would "run[] counter to the terms of the Policy concerning eligibility for" LTM increases. (Id.)

Although the Confirmation Statements may not automatically become part of the Policy, the Policy clearly states that the Confirmation Statements indicate the insured's

plan selection and premium amount. Therefore, it is plausible that the Confirmation Statements modified or endorsed the Policy. Further, each Confirmation States provides that "[a]ll benefits are subject in every way to the entire Group Contract which includes the Certificate of Insurance." (SAC, Ex. D, F.) The SAC further alleges that the Certificate of Insurance ("492K COI") reflected the LTM of $492,750.[2] (Id. ¶ 35.) Thus, Matthews has stated a plausible claim for breach of contract.

Finally, Prudential argues that Nosek did not pay increased premiums for the increased LTM and, thus, there was no consideration to support contract modification. (Mot. at 18.) However, Matthews points to several instances in which the SAC alleges that Nosek paid the higher premiums outlined in the Inflation Offers. (Opp'n at 12.) First, the SAC alleges that Nosek "performed under the contract by paying the premium payments." (Id; SAC ¶ ¶ 105-106, 109.) Matthews claims that ¶ 105 of the SAC makes clear that these premium payments "refer[] to the premiums called for in the Inflation Offers." (Id.) Additionally, in ¶ 114, the SAC "references the contracted-for benefits in the Inflation Offers and alleges that she and Plaintiff Class paid those premiums," and in ¶ 134 Matthews alleges that Prudential "negligently allowed these many misrepresentations of a higher LTM to stand uncorrected until January, 2022, and accepted increased premiums until that time." (Id.) Finally, in its motion Prudential admits that, when it "administratively reversed" the Policy's LTM and premium increases, it refunded Nosek's inflated premium payments. (Mot. at 15.) Thus, the SAC properly alleges consideration. The Court **DENIES** Prudential's motion to dismiss the breach of contract claim on this theory.

[2] The Court notes that the parties disagree on the definition of the 492K COI and 425K COI. While the SAC refers to these documents as Certificates of Insurance, Prudential argues that these documents were merely Confirmation Statements. (SAC, ¶¶ 35, 72; Mot. at 17-18.) SAC, Exhibit D makes clear that each Confirmation Statement came in a package which also contained a Certificate of Insurance and a copy of the Long-Term Care Insurance Claims Process. (Id. Ex. D.) Although the SAC alleges that the updated LTM was located in both the Confirmation Statement and 492K COI, "attached as Exhibit D," Exhibit D is labeled "Confirmation Statement" only. (Id. ¶ 35; Id. Ex. D.) However, the SAC also states that the "[t]he 492K COI was the cover sheet attached to" the Policy contract, which is consistent with this Court's understanding of a Certificate of Insurance. (SAC ¶ 35-36.) The Court notes this discrepancy, but construes these allegations in the light most favorable to Matthews for the purpose of this motion. Thus, because the SAC alleges that the Certificate of Insurance noted the increased LTM, Matthews has stated a plausible claim for breach of contract.

*C. Matthews' Breach of the Covenant of Good Faith and Fair Dealing Claim*

Prudential moves to dismiss Matthews' breach of the covenant of good faith and fair dealing claim "because it lacks the necessary predicate of a breach of contract and because the SAC fails to allege any unreasonable conduct by Prudential." (Mot. at 2.) Although the Court finds that Matthews has stated a viable breach on contract claim, Prudential argues that the SAC allegations "show Prudential's good faith attempt to comply with the Policy by trying to find the Insured *continuously* benefit-eligible." (Id. at 21.) In her Opposition, Matthews fails to address Prudential argument regarding the breach of the covenant of good faith and fair dealing cause of action. Therefore, under existing case law, Matthews has abandoned this claim. See Conservation Force v. Salazar, 677 F. Supp. 2d 1203, 1211 (N.D. Cal. 2009) ("Where plaintiffs fail to provide a defense for a claim in opposition, the claim is deemed waived.") (citing Personal Elec. Transps., Inc. v. Office of U.S. Tr., 313 Fed. App'x 51, 52 (9th Cir. 2009)). Consequently, the Court **GRANTS** the motion to dismiss with prejudice in regard to this cause of action.

*D. Matthews' Negligent Misrepresentation Claim*

Prudential moves to dismiss Matthews' negligent misrepresentation claim because it is allegedly time-barred, Matthews "fails to adequately allege that Prudential lacked reasonable grounds for believing the purported misrepresentations," Matthews "fails to adequately allege justifiable reliance," and the claim is barred by the economic loss rule. (Mot. at 2, 26.) The Court begins by discussing the applicability of the economic loss rule.

Prudential argues that the negligent misrepresentation claim is "duplicative" of the breach of contract claim and, thus, is barred by the economic loss rule. (Id. at 26.) The general economic loss rule is simple: to preserve the distinction between contract and tort law a purchaser can only recover in contract for purely economic loss unless the purchaser "can demonstrate harm above and beyond a broken contractual promise." Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 988 (2004); see also Erlich v. Menezes, 21 Cal. 4th 543, 553 (1999). Therefore, there is only a remedy under both tort and contract law when an independent duty arising from tort law is violated. Id. at 990. While there is no bright line application, courts have generally found tortious breach of

contract when "the breach is accompanied by a traditional common law tort, such as fraud or conversion; the means used to breach the contract are tortious, involving deceit or undue coercion; or one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm." Id. "'Courts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.'" Erlich, 21 Cal. 4th at 552 (quoting Freeman & Mills, Inc. v. Belcher Oil Co., 11 Cal. 4th 85, 91 (1995)).

Prudential argues that the economic loss rule applies because the harm that Matthews alleges "is entirely derived from the contractual relationship between Prudential and the Insured." (Mot. at 26.) Accordingly, both claims are "premised on the same allegations... that Prudential allegedly misrepresented that the Inflation Offers applied and the Policy's LTM thus increased to $492,750 and then to $571,225." (Id.) Further, Prudential claims that the negligent misrepresentation cause of action is barred by the economic loss rule because the alleged misrepresentations occurred after contract formation, and did not induce Nosek into the contract. (Reply, at 17.)

Matthews relies on Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc., in arguing that the economic loss rule should not apply. No. 116CV00371DADSMS, 2016 WL 3519294 (E.D. Cal. June 27, 2016). In Bret Harte the plaintiff purchased a synthetic turf athletic field from the defendants based on representations made in the defendants' marketing materials. Id. at *2. The parties subsequently entered into a contract in which the defendants represented that the field was free from defects. Id. The plaintiff brought a breach of contract claim alleging that the "defendants failed to make good on their warranty when they failed to replace the field," and a negligent misrepresentation claim alleging that "plaintiff would not have entered into this contract absent alleged defendants' misrepresentations." Id. at *5. The court in this case recognized that "the economic loss rule may bar negligent misrepresentation claims where the allegations run 'closely parallel' to a concurrent breach of contract claim." Id. However, the economic loss rule did not apply to the two claims at issue because the negligent misrepresentation claim alleged that "plaintiff would not have entered into this contract absent alleged defendants' misrepresentations," whereas the breach of contract claim focused on the breach of warranties within the contract. Id. Thus, the court found that the negligent

misrepresentation claim "sound[ed] more in deceit/fraud that it [did]... in negligence." Id.

Matthews argues that, similar to the causes of action in Bret Harte, the breach of contract and negligent misrepresentations claims in this case are distinct. (Opp'n at 18.) Specifically, while the breach of contract claim is based on the changing of the LTM after the sending of Inflation Offers and Confirmation Statements, the negligent misrepresentation cause of action is premised on the fact that Matthews "reasonably relied on the representations and took certain actions while avoiding other actions as a result." (Id. at 18-19.) The Court finds this analogy unpersuasive. In Bret Harte, the alleged negligent misrepresentation occurred prior to the execution of the contract. 2016 WL 3519294 at *5. In contrast, the alleged misrepresentations in this case occurred in tandem with the breach of contract, and are premised on the same set of facts and contractual duties. See Scosche Indus., Inc. v. S & T Montgomery Distrib., Inc., No. 2:22-CV-09030-SVW-MAA, 2023 WL 5506021, at *4 (C.D. Cal. July 6, 2023) (finding that the economic loss rule applied when "the misrepresentations did not seem to occur until several years into the performance of the contract.")

Further, the court in Bret Harte found that the defendants' actions were more akin to "deciet/fraud" than negligence because the defendants were aware of problems with their products prior to making the representations. 2016 WL 3519294 at *2, 5. In contrast, Matthews has not properly alleged that Prudential intentionally or affirmatively misrepresented the LTM and premium amounts. In fact, the SAC states that Prudential rescinded the increased LTM "due to a mistake" and "negligence." (SAC ¶ 21.) See Veasna Chan Hun v. Hajjar, No. CV 18-10330 PSG(KSX), 2019 WL 8221087, at *5 (C.D. Cal. Sept. 3, 2019) ("If Defendants did not intentionally, but only negligently misrepresented the information that caused Plaintiff to enter the MOU, the economic loss rule still bars this claim.") Thus, because the negligent misrepresentation cause of action is barred by the economic loss rule, the Court **GRANTS** the motion to dismiss this cause of action with prejudice.

*E. Matthews' Unfair Competition Law Claim*

Prudential moves to dismiss Matthews' Unfair Competition Law ("UCL") claim because the "Policy justified Prudential's actions" and Prudential's "actions adhere[d] to

[the] contractual terms." (Mot. at 2, 27.) According to Prudential: "the Court's finding that Prudential did not breach the contract supports dismissing this UCL claim, as Prudential's actions, being justified and indeed, required, by the Policy render Plaintiff's UCL unfairness-prong claim inactionable as a matter of law." (Id. at 27.) In response, Matthews states that it has alleged a viable breach of contract claim based on Prudential's issuing of the Confirmation Statements; thus, the SAC states a viable UCL claim. (Opp'n at 19.) As described above, Matthews has alleged a viable breach of contract claim. Consequently, because Prudential rests its motion to dismiss the UCL claim on its adherence to the contract, the Court **DENIES** the motion to dismiss the UCL claim.

*F. Matthews' Class Allegations*

Finally, Prudential moves to strike the class allegations because no class can be certified on the face of the SAC. (Mot. at 3.) Prudential claims that the SAC includes "highly individualized allegations that cannot be proven with common evidence or generate common answers from such evidence." (Id. at 27.) For example, the SAC primarily focuses on "letters and phone calls between Prudential," Matthews, and Nosek regarding Nosek's LTM and benefits-eligibility status. (Id. at 29.) Further, the putative class member's claims require "individualized proof" of "the mix of information that was available to each purchaser at critical points and how each purchaser understood and relied on such information." (Id.) Additionally, Prudential argues that "there are no allegations in the SAC to indicate that Plaintiff's unique facts have presented in any other person, let alone uniformly across a class." (Id. at 30 n.4.)

In response, Matthews argues that the SAC "is not predicated on highly individualized facts," and that "class actions can be appropriate when individualized inquires are necessary." (Opp'n at 20.) Matthews claims that "common questions of fact predominate" in this case because "all proposed class members purchased... policies from Defendant, and all were potentially injured by Defendant's alleged unilateral reduction in the LTM after providing an amended contract with an increased LTM and increased premium." (Id. at 22.) Thus, "[t]he only individualized questions might be how much each individual's LTM was reduced and what damages were incurred by class members as a result." (Id. at 20.)

Because the Court grants the motion to dismiss the breach of the covenant of good faith and fair dealing and the negligent misrepresentation claims, the motion to strike the class allegations for these claims is moot. Thus, the Court addresses the motion to strike as to the breach of contract and UCL claims only.

1. Matthews' Breach of Contract Claim

Prudential argues that Matthews cannot prove her breach of contract claim on a class-wide basis because the claim rests on whether the insured was benefits-eligible at the time that the Inflation Offers were sent, and whether the insured attempted to accept the offers, which is an individualized inquiry. (Mot. at 30.) Matthews argues that this is not a highly individualized issue because the SAC "alleges this was a pattern and practice to pull the bait and switch of reducing LTMs to their lower rates if a non-eligible person gained an increase in LTM and then went back to eligibility." (Opp'n at 23.) As outline above, Matthews has stated a valid breach of contract claim based on the Confirmation Statements sent to insureds even if the insureds were deemed benefits eligible through the relevant periods. Further, the Court agrees with Matthews that the SAC's allegations of Prudential's "pattern and practice" are not individualized. Thus, because it is not clear that no class can be certified on the face of the SAC, the Court **DENIES** the motion to strike the class allegations.

2. Matthews' UCL Claim

Finally, Prudential argues that Matthews' UCL claim is not ripe for class adjudication because such a class-wide claim would required Matthews "to prove that the putative class members have 'suffered injury in fact and[...] lost money or property as a result of the unfair competition.'" Cal. Bus. & Prof. § 17204. (Mot. at 32.) Prudential cites to Kwikset Corp. v. Sup. Ct. for the contention that the language "as a result of" requires a plaintiff to show a causal connection or reliance on the misrepresentation to state a valid UCL claim. 51 Cal. 4th 310, 326 (2011). Thus, this inquiry regarding the class member's reliance on Prudential's unfair actions "is necessarily individualized and will not generate the same answer for all insureds." (Mot. at 33.)

In response, Matthews argues that Prudential misconstrues what is required to demonstrate damages as a result of unfair competition, and states that "[i]t is a simple damages inquiry." (Opp'n at 25.) Matthews claims that "[i]f a class member had their

LTM reduced after a Confirmation Statement promised it had increased, then any out-of-pocket expenses above the improperly-reduced LTM should be compensated." (Id.) Thus, "[t]his is an individual calculation of *damages* only, not of causation, and individual damage calculations are often permitted in class actions." (Id.)

Courts differ as to whether individualized proof of reliance is required for a UCL claim. See Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1020 (9th Cir. 2011), abrogated on other grounds by Comcast Corp. v. Behrend, 569 U.S. 27 (2013), citing In re Tobacco II Cases, 46 Cal. 4th 298, 320 (2009) (reversing a district's court's denial of a class certification motion on a UCL claim because "'relief under the UCL is available without individualized proof of deception, reliance, and injury.'") Further, a court may be able to calculate reliance in this case based on the "out-of-pocket expenses above the improperly-reduced LTM." (Opp'n at 25.) Consequently, the Court finds that it is not clear that the class claims cannot be maintained, and this issue is better left for the class certification phase. The Court **DENIES** the motion to strike the class allegations.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the request for judicial notice as to Silva Decl. Ex. 6-9 and **DENIES** the request as to Silva Decl. Ex. 10. Further, the Court **DENIES** the motion to dismiss as to Matthews' breach of contract claim and UCL claim, and **GRANTS** the motion with prejudice as to Matthews' breach of the covenant of good faith and fair dealing claim and negligent misrepresentation claim. Finally, the Court **DENIES** the motion to strike the class allegations.

**IT IS SO ORDERED.**